IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **JEFFERY S. REINICHE and ANN C. SICKON,** both individually and derivatively on behalf of **HEALTH ALLIANCE HOLDINGS, INC.,**  )<br>)<br>)<br>)<br>**Plaintiffs,**  )<br>)<br>vs.  )<br>)<br>**JAMIE MARTIN, E.B. MARTIN, Jr., HA ACQUISITION, LLC, and EBM VENTURES, LLC,**  )<br>)<br>)<br>)<br>**Defendants.**  ) | FILED: MAY 28, 2008<br>08CV3093      TC<br>JUDGE GETTLEMAN<br>MAGISTRATE JUDGE COLE<br><br>**Case No.**<br><br>**Jury Demanded** |

## COMPLAINT

Plaintiffs Ann C. Sickon and Jeffery S. Reiniche, both individually and derivatively on behalf of Health Alliance Holdings, Inc., for their complaint against defendants Jamie Martin, E.B. Martin, Jr., HA Acquisition, LLC, and EBM Ventures, Inc, state as follows:

### NATURE OF THE ACTION

1. This is an action for declaratory judgment and breach of fiduciary duty brought by Ann C. Sickon and Jeffery S. Reiniche, both individually and derivatively on behalf of Health Alliance Holdings, Inc, to recover damages from defendants for their *ultra vires* conduct in connection with two corporate restructuring transactions in 2003 and 2004.

### GENERAL ALEGATIONS

### JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy exceeds the sum or value of $2,000,000, exclusive of interest and costs, and is between citizens of different States.

3. Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2), as a substantial part of the events or omissions giving rise to the action occurred in this judicial district and defendants do substantial business within this district.

## PARTIES
### (Plaintiffs)

4. Plaintiff Jeffery S. Reiniche ("Reiniche") is a North Carolina citizen and resident. Reiniche is a minority shareholder of Health Alliance Holdings, Inc.

5. Plaintiff Ann C. Sickon ("Sickon") is an Illinois citizen and resident. Along with Mark A. Swift ("Swift") and other investors, Sickon formed Health Alliance, LLC, in the late 1990s to deliver low cost prescriptions and other medical supplies to state Medicaid and federal Medicare beneficiaries, among others. Sickon is a minority shareholder of Health Alliance Holdings, Inc.

6. Plaintiff Health Alliance Holdings, Inc. ("Health Alliance Holdings") is a Delaware Corporation, with its principal place of business located in Illinois.

### (Defendants)

7. Defendant Jamie Martin is a citizen and resident of Jackson, Mississippi.

8. Defendant E.B. Martin, Jr., is a citizen and resident of Jackson, Mississippi.

10. Defendant HA Acquisition, LLC. ("HA Acquisition") is a Mississippi limited liability company, with its principal place of business located in Jackson, Mississippi.

11. Defendant EBM Ventures, LLC. ("EBM Ventures") is a Mississippi limited liability company, with its principal place of business located in Jackson, Mississippi.

### (RELEVANT NON-PARTY CORPORATE ENTITIES)

12. Health Alliance, LLC, was formed by Swift in 1997. Health Alliance, LLC, was the operating company and main asset being transferred in the allegedly *ultra vires* corporate restructuring transactions in 2003 and 2004.

2

13. American Disease Management Group, Inc. ("ADMG") was formed by Swift and other investors in 1999 and originally held the entire membership interest in Health Alliance, LLC.

## FACTUAL ALLEGATIONS

14. Swift and other investors formed Health Alliance, LLC, in 1997, to deliver low-cost medical supplies and prescription pharmaceuticals to patients with chronic medical conditions. These patients—Medicare and Medicaid beneficiaries and other enrollees in third-party plans administered by state governments and the Federal Government—were delivered their drugs and related medical supplies via mail order by Health Alliance, LLC.

15. In 1999, Swift and additional investors incorporated ADMG to hold the membership interest in Health Alliance, LLC. As of early 1999, when ADMG was incorporated, Swift owned approximately 56 percent of ADMG and ADMG owned 100 percent of the membership interest in Health Alliance, LLC.

16. Over the next two years, into 2001, Health Alliance, LLC's business expanded, more patients were being served, the need for working capital increased, and additional investors were sought. Investors associated with defendants, including the MTS/Ashcroft Group, were solicited. Health Alliance Holdings, Inc. was formed by Swift in 2001 when these additional investments were made in Health Alliance, LLC.

17. In 2002 and 2003, these new investors, including defendant Jamie Martin, began exercising greater control over Health Alliance, LLC through their interest in Health Alliance Holdings.

18. In May, 2002 a shareholder agreement was executed by Health Alliance Holdings which provided for certain shareholder rights to ADMG, including seats on the Board of Health Alliance Holdings as well as a full shareholder vote with respect to any actions by the Health Alliance Holdings Board that would dilute ADMG shareholder rights. At the time of the May,

3

2002 shareholder agreement Swift owned approximately 3.8 percent of Health Alliance Holdings and ADMG owned 37.9 percent of Health Alliance Holdings.

## **THE UNAUTHORIZED AND ULTRA VIRES MAY, 2003 TRANSACTION**

19. In March, 2003, Swift and ADMG were apprised by Douglas Cook, an Executive Vice-President of Health Alliance Holdings, of a new financing proposal for Health Alliance Holdings, which called for the relinquishment of certain ADMG shareholder rights in Health Alliance Holdings.

20. Swift was terminated by Health Alliance Holdings in March, 2003. Upon his termination, in violation of his employment agreement with Health Alliance Holdings, Swift did not receive the eighteen months severance payment, in the amount of $375,000, together with insurance and other related benefits.

21. On May 29, 2003, defendants purported to recapitalize and reorganize Health Alliance Holdings and purported as well to create an entity known as "HA Holdings" to hold the membership interest in Health Alliance, LLC. Prior to the May 29, 2003 transaction, Swift and ADMG owned the largest shareholder block in Health Alliance Holdings, constituting in excess of 40 percent of all outstanding shares.

22. Since Swift and ADMG owned in excess of forty percent of Health Alliance Holdings shares, and Delaware Corporation law requires a "super majority" greater than 67% of outstanding shares) to approve any corporate restructuring, the approval of Swift and ADMG was necessary for any corporate restructuring of Health Alliance Holdings. (Del. General Corp. Law, CH.1, Sub. Ch V1, Sec. 203: Business Combinations with Interested Shareholders.)

23. Neither Swift, individually, nor ADMG ever approved the final May, 2003 restructuring of Health Alliance Holdings as required by the bylaws of Health Alliance Holdings and Delaware law.

24. The Health Alliance Holdings Board—which now included defendant Jamie Martin—in order to "approve" the May, 2003 restructuring, altered, without Swift's knowledge, a signature page, effectively falsifying Swift's signature on a document necessary to effectuate the transaction.

25. The May, 2003 transaction was implemented without: (a) the approval of Swift as required under the by-laws of Health Alliance Holdings, Inc.; (b) without the approval of ADMG, the largest single shareholder of Health Alliance Holdings, Inc.; and (c) without the approval of the other minority shareholders associated with Mark Swift. The May 2003 transaction, without these approvals, was invalid and *ultra vires* under Delaware law.

26. After the May, 2003 transaction was purportedly approved, Swift received e-mails from MTS and the MTS's attorneys with revisions to the purportedly final restructuring transaction. Swift never agreed to any of the purported revisions just as he had not approved the purportedly "final" May, 2003 transaction.

27. During June, 2003, a colleague of Swift's, John Tollefson, was called repeatedly by officers and directors of Health Alliance Holdings demanding that Tollefson assist in obtaining Swift's approval for the May, 2003 transaction. Neither Swift nor ADMG ever approved the May, 2003 transaction.

**THE UNAUTHORIZED *ULTRA VIRES* NOVEMBER 2004 TRANSACTION**

28. On or about November 5, 2004, an HA Holdings board meeting was convened for the sole purpose of gaining the consent of all shareholders for the sale of the membership interest in Health Alliance, LLC, to HA Acquisition and EBM Ventures, the entities created and controlled by defendant E.B. Martin, Jr.

29. As a measure of the value of Health Alliance, LLC, at the time of the November, 2004 transaction, on October 15, 2004 Critical Care Solutions ("CCS"), another firm in the

5

pharmaceutical delivery industry, tendered a Letter of Intent to purchase a limited number of patients from Health Alliance, LLC, for $2 million dollars.

30. The proposed CCS transaction would have left the bulk of patients and the tangible and intangible assets in place with HA Holdings. At approximately the same time, DeliverMed, a company associated with Mark Swift and his investors, also proposed to purchase Health Alliance Holdings for in excess of $2 million on a similar per-patient valuation formula. Both the CCS and DeliverMed bids were made for only a small portion—approximately 20 percent—of Health Alliance, LLC's patients.

31. Neither the CCS nor DeliverMed offers was even voted on by the HA Holdings Board prior to the November, 2004 transaction.

32. Prior to the November 5, 2004 HA Holdings meeting, the defendants through their agents offered Mark Swift (1) a release of Swift's guarantee and pledges of assets to secure certain loans to Health Alliance, LLC and Health Alliance Holdings, Inc. and (2) payment of an outstanding note to Mark Swift from Health Alliance Holdings, Inc. These offers were made via e-mail, physical copies delivered personally to Mark Swift, as well as in direct conversations with Mark Swift.

33. On or about November 9, 2004, defendants proposed and proceeded with a transaction or series of transactions by which the assets of HA Holdings and Health Alliance LLC were transferred to entities controlled by defendants. The Memorandum of Agreement ("MOA") provided that HA Holdings had experienced significant financial difficulties. It further provided that, but for the sale to the E.B. Martin, Jr., entities for this nominal sum, Health Alliance, LLC, would have had to liquidate, seek bankruptcy protection, or otherwise terminate its business.

34. As part of the November Transaction, defendants' agent, John Hennessy, offered Swift certain consideration to authorize a document (the "Release"), prepared by the

6

Defendants, by which Swift released all claims to ownership of the assets that were the subject of the November Transaction as well as releasing various other claims against the Defendants.

35     As partial consideration for the Release, the Defendants agreed to obtain for Swift to release all liability claims that the CIB Entities held against Swift.  Swift had previously incurred liability to the CIB Entities as part of a series of transactions involving the Swift and some or all of the Defendants. Swift's liabilities to CIB included a personal guarantee of a loan.  Agents of the defendants sent written confirmation of the proposed terms to Swift, including the release of the CIB obligations that Swift had guaranteed.

36.     As partial consideration for the Release, the Defendants, through their agent John Hennessey, agreed to provide Swift with a sum of $2.5 million in payment of his notes from the Health Alliance entities.

37.     Swift signed the Release on or about November 1, 2004 and modified the Release with hand-written conditions stating, in essence, that the Release was not final or effective until (i) the Release had been notarized; and (ii) all other aspects of transaction had been finalized.

38.     Swift and the Defendants both understood this hand-written notation to mean that the Release would not be final or effective until (i) Swift received his promised releases from the CIB entities; and (ii) Swift received his promised $2.5 million.

39.     At the time Swift signed the Release, Swift crossed out the notary block that was printed below the signature block.

40.     The Release was to be delivered at the closing for the November Transaction, so long as Swift had received the CIB entities' releases and the payment by that point.

41.     No release of Swift's liability from the CIB Entities was ever delivered to Swift or the CIB Entities after the closing of the November Transaction.

42. No payment of $2.5 million dollars or any other sum was ever made to Swift.

43. Because these conditions were never met, the Release was never effective or final and Swift never authorized the delivery of the Release. The Altered Release is copy of the Release that has been altered in a fraudulent and material manner.

44. One effect of the alterations was to remove the hand-written modifications to the Release, described above, from the face of the document.

45. As described above, at the time Swift signed the Release, he crossed out the notary block that appeared printed below the signature block. That marking has been removed from the Altered Release.

46. The Altered Release purports to have been notarized by Patricia Montgomery, Notary Public in Cook County, Illinois, on November 1, 2004. That notarization is fraudulent.

49. To the extent that the Release was altered after the Swift had signed it, the Release was procured by the Defendants as fraud *in factum* upon Swift's estate.

50. Between November 1, 2004 and November 10, 2004, Swift received a series of emails from John Hennessy requesting that Swift sign the Release. On November 10, 2004, at least nine days after Mark Swift's alleged signature was notarized by John Hennessey's secretary—the same secretary and notary—sent an e-mail to Mark Swift requesting Swift's signature on the same document she had purportedly notarized on November 1, 2004.

51. After the November, 2004 transaction was approved by the HA Holdings, Inc's. Board, defendants, through their agent, John Hennessy, continued to send Swift emails representing that the CIB entities had released Swift from Swift's guarantees and that those releases would be sent to Swift within days. No such releases were ever sent to Swift. Hennessy attempted to obtain approval for the sale from Swift and the other minority shareholders for a number of days after the fact. Swift and the other minority shareholders refused to grant such

8

approval, as they had never been provided with any documentation on the transaction that they were being asked to approve.

52.     The May, 2003 and November, 2004 Transactions, taken together, were based upon alleged approvals and releases which were never obtained from Swift and from other required parties.

53.     In January, 2005, Mark Swift sent a fax to defendants E.B. Martin, Jr. and Jamie Martin and their transactional attorneys stating that the November, 2004 transaction was null and void and that none of the promised consideration had ever been provided by defendants.

54.     The sale to defendants of the Health Alliance, LLC membership interest was conducted in a collusive manner, as based upon fraudulent documents

55.     The May, 2003 transaction, which was an essential element in defendants' fraudulent scheme, was based upon materially altered signatures and required approvals that were never obtained.

56.     The two transactions damaged Swift by causing to become due significant loan guarantees and pledges by Swift based upon prior loans made by the CIB entities to Health Alliance Holdings. The two Transactions triggered Swift's guarantee obligations at a time when there were no assets from the restructured entity, Health Alliance Holdings, to repay the loans or guarantee. Swift therefore remained individually liable for Health Alliance Holdings, Inc.'s obligations while the defendants took all the assets.  The transactions also left unpaid substantial direct loans by Swift to Health Alliance Holdings, Inc. and left no assets to repay the direct loans from Swift to Health Alliance, LLC and Health Alliance Holdings, Inc.

57.     These two ultra vires transactions thus damaged Swift individually as a guarantor of Health Alliance Holdings, Inc's debts.

## COUNT I: DECLARATORY JUDGMENT

58. Plaintiff re-alleges and incorporates the allegations contained paragraphs 1-57 above as if the same were fully set forth herein.

59. Based on the foregoing allegations, there exists between the parties a substantial controversy as to whether the May 2003 and November 2004 transactions were *ultra vire*s under Delaware law sufficient to warrant declaratory relief.

60. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that these two corporate transactions were improper and without basis in Delaware corporation law, the parties' various agreements, or the common law.

WHEREFORE, plaintiff prays (1) for a declaration that the May 2003 and November 2004 transactions were *ultra vire*s under Delaware law; (2) for attorneys' fees; (3) costs; and (4) for such other and further equitable and legal relief as the Court shall find necessary and just.

## Count II: Breach of Fiduciary Duty

61. Plaintiff re-alleges and incorporates the allegations contained paragraphs 1-57 above as if the same were fully set forth herein.

62. As of September 30, 2004, Health Alliance, LLC, had a financial net worth of between $3 and $4 million and a market value estimated by management to be in excess of $30 Million.

63. In October, 2004, HA Holdings—which now owned 100 percent of the membership interest in Health Alliance, LLC, was put up for sale and, two weeks later, Chronic Care Solutions ("CCS") tendered a letter of intent to purchase certain limited assets of HA Holdings for $2 million. This offer was summarily rejected, without being submitted to the HA Holdings Boards

64. On October 15, 2004, Swift and his associates through DeliverMed made a proposal without having access to the books and records of Health Alliance Holdings, HA

10

Holdings or Health Alliance, LLC, to purchase the Health Alliance, LLC membership interest. That proposal was never considered by the defendants or their agents. On or about October 15, 2004an HA Holdings Board meeting was held telephonically. The DeliverMed proposal was shouted down by Curtis Lane who said to Kevin Swan that the decision had been made by the Board "to give the company to Jamie Martin." Curtis Lane told Kevin Swan "to make it happen."

65.    On or about November 9, 2004, a Memorandum of Agreement ("MOA") confirmed the sale of all assets of and ownership in the company to the entities controlled by defendant E.B. Martin, Jr., for the nominal sum of $10.00.

66.    Nowhere did the MOA state or provide the true financial position of Health Alliance, LLC, as set forth in the September 30, 2004 balance sheet.

67.    As described above, defendants' actions in selling all Health Alliance Holdings assets for substantially less than the fair market value of such assets to insiders—while rejecting a more valuable bid for only a portion of these assets only weeks before—was intentional, willful and wanton, and made with conscious disregard for plaintiffs rights as shareholders, and a breach of their basic fiduciary duties to all shareholder.

WHEREFORE, plaintiffs request the following relief: (1) a declaration that defendants breached their fiduciary duties to plaintiff; (2) judgment in plaintiffs' favor and against defendants for in excess of $2,000,000.00, plus interest and costs of suit, the specific amount to be determined at trial; (3) punitive damages; (4) prejudgment interest; and (5) such other and further relief as this Court deems necessary and just.

**ANN C. SICKON and JEFFERY S. REINICHE,
both individually and derivatively on behalf of
HEALTH ALLIANCE HOLDINGS, INC.,**

By: /s/Brian C. Witter_____
One of their Attorneys

**Dated: May 28, 2008**

Brian C. Witter
**Law Offices of Brian C. Witter, P.C.**
111 West Jackson Boulevard
Suite 1100
Chicago, IL 60604
(312) 961-4942 (T)
(312) 386-9759 (F)
*briancwitterpc@gmail.com*

James A. McGurk
**Law Offices of James A. McGurk, P.C.**
10 South LaSalle Street
Suite 3300
Chicago, IL  60603
(312) 236-8900
Fax (312) 277-3497
**Attorneys for Plaintiffs**