**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JEFFREY S. REINICHE, DR. ARTHUR CHAUSMER, and GARY POST, derivatively on behalf of HEALTH ALLIANCE HOLDINGS, INC., derivatively on behalf of HA HOLDINGS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JAMIE MARTIN, CURTIS LANE, ANDREW M. PAIL, KEVIN SWAN, MTS HEALTH ALLIANCE, LLC, ASHCROFT ASSOCIATES, LLC, JAMES KELLY, ALLEN PALLES, JOHN HENNESSY, JOHN SABALASKEY, M-1, LLC, SCOGGIN CAPITAL MANAGEMENT, L.P. II, SOUTHERN DIVERSIFIED BUSINESS SERVICES, INC., JON KAIDEN, SELECT CAPITAL VENTURES I., L.P., E.B. MARTIN, JR., HA ACQUISITION, LLC, AND EBM VENTURES, LLC, <br><br> Defendants. | No. 08 C 3093 <br> Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

**I. BACKGROUND**

Plaintiffs Reiniche, Chausmer and Post ("Individual Plaintiffs") have been shareholders of Health Alliance Holdings, Inc., ("HAH") a Delaware corporation, since 2002. They bring suit to compel HAH to sue derivatively on behalf of HA Holdings ("Holdings"), a Delaware corporation, for breaches of fiduciary duty by the directors and shareholders of HA Holdings. This is essentially a double derivative suit.

The complicated facts of this case require extensive explanation. The story begins with Health Alliance, LLC ("Health Alliance"), an Illinois company, which is not a party to this action. Health Alliance was formed in 1997 by Mark Swift to sell by mail diabetic and asthma patient care products and medicines to Medicaid beneficiaries and other enrollees. Health Alliance contracted with states to process orders and deliver supplies at a discounted rate. In 1998 Swift formed American Disease Management Group, Inc. ("ADMG"), a Delaware corporation, to provide Health Alliance with additional capital. This money would be used to fill the gap between the time the prescriptions were purchased, and the time of reimbursement by the state, approximately a thirty-five to sixty-day period. ADMG acquired 100% of the membership interest of Health Alliance.

In 2001, after acquiring several new contracts with various states, Health Alliance required another infusion of capital. ADMG, along with Defendant Jamie Martin and others founded HAH to raise the necessary capital. HAH acquired the membership interest in Health Alliance from ADMG, and ADMG became a majority 53.88 percent shareholder in HAH.

In May 2002, HAH, Health Alliance, ADMG, and others, entered into a Securities Purchase Agreement with MTS Health Alliance, L.L.C. ("MTS") and Ashcroft Associate, LLC ("Ashcroft"). Pursuant to this agreement, MTS and Ashcroft invested $11 million in HAH, and were each granted three seats on the HAH board of directors. The other five seats on the board were to be designated by a majority-in-interest of the existing shareholders, who at the time consisted of ADMG. The directors initially representing ADMG were Mark Swift, John Hennessey, Jamie Martin, Douglas Cook, and Robert Kominsky. The original MTS directors

were Terrence Quinn, Curtis Lane, and Allen Palles. The original Ashcroft directors were Andrew Paul, Malcom Kostuchenko, and H. Bradley Sloan.

In May 2003, Holdings was formed to acquire 100% of HAH's membership interest in Health Alliance. As a result, HAH was a 45% shareholder in Holdings. In November 2004, Holdings sold its interest in Health Alliance to H A Acquisition, LLC ("Acquisition") for $10, plus certain debt relief, the exact amount of which has not been disclosed to Plaintiffs. It is this transaction that is the subject of this suit. Plaintiffs claim that in May 2004, Holdings valued Health Alliance at $35 to $38 million. They alleged that in October 2004, two other companies, Chronic Care Solutions and DeliverMed, which was associated with Swift, made offers to purchase certain assets of Health Alliance. Chronic Care's offer was $200 per patient for 10,000 of the 45,000 total patients, amounting to $2 million. DeliverMed offered to pay $275 per patient and $0.25 on the actual invoice dollar cost of inventory of certain Health Alliance pharmacies. No vote was taken on either of these offers.

At the time of the transaction, Defendant Palles, Swift, and Malcom Kostuchenko were directors of HAH (prior to May 2003, the board consisted of nine members including Defendants Lane, Paul, and Defendant Jamie Martin). Defendants Jamie Martin, Swan, Paul, and Lane (collectively "Defendant Directors") were the directors of Holdings. MTS, Ashcroft, Jamie Martin, Kelly, Palles, Swan, Hennessey, Sabalaskey, M-1, Scoggin, SDBS, Kaiden, and Select Capital (collectively "Defendant Shareholders") were shareholders of Holdings who voted for the November 2004 transaction. Plaintiffs also claim that during the relevant period Defendants were involved in many other joint business ventures and relationships with one another, alleging (1) Defendant Swan was an employee or agent of Defendant MTS; (2) Defendant Jamie Martin,

3

wife of Defendant E.B. Martin, was a member and manager of EBM Ventures, LLC, an investor in Acquisition; (3) E.B. Martin is the manager and a member of EBM Ventures; (4) Lane of MTS and Paul of Ashcroft together founded MTS Health Partners, L.P., an entity affiliated with MTS; (5) MTS Health Partners, L.P. handles investments for SDBS and directed it to invest in Holdings; (6) Hennessy was an agent of the Martins who handled the transaction and was named Executive Vice President of Acquisition after the November 2004 transaction; (7) Kaiden and Paul are members of private equity firm Sopris Capital, its current portfolio includes MTS Health Partners, Inc.; (8) Paul is also on the Advisory Board of Select Capital, a shareholder of Holdings; (9) Jamie Martin and E.B. Martin are involved in substantial business dealings with Enhanced Capital Partners, LLC, which was founded by Paul and of which Paul is the Chairman of the Board of Directors; (10) Palles was a consultant and shareholder of Holdings and HAH and was affiliated with MTS Investors, LLC, CIB Marine Capital, LLC, and CIB Bank, which had provided financing for the entities and held outstanding warrants for Health Alliance Holdings; (11) both MTS and Palles became Series A preferred stockholders in Holdings after the 2003 reorganization; (12) Palles is employed by MTS; (13) Kostuchenko is also affiliated with MTS, and Kostuchenko and MTS Investors are investors in many other businesses with the Martins.

     Plaintiffs maintain that beginning in 2002, Defendant Directors and Shareholders sought to freeze them and other HAH shareholders out through a series of "ultra vires, wasteful, unfair, and illegal acts," and Defendants Acquisitions and its investors EBM and E.B. Martin, knowingly participated in these acts. According to Plaintiffs, there was no shareholder vote for the May 2003 transaction, HAH was denied its right to seat a member on the Holdings board of

directors, and due to mass resignations, there was no quorum present for the Holdings board meeting during which the November 2004 transaction was approved, invalidating the transaction. After the board approval, it issued a Memorandum of Agreement between Health Alliances, Holdings, Acquisition, and EBM for the sale of Holdings' membership interest in Health Alliance to Acquisition. Pursuant to the Agreement the Holdings shareholders were to confirm their agreement to transfer and execute a release of Health Alliance, Acquisition, and EBM from any claims. Plaintiffs claim that HAH, as shareholder of Holdings never agreed to the transfer, and neither Swift nor HAH signed any release. According to Plaintiffs, a release bearing Swift's signature is a forgery.

The complaint alleges that the November 2004 transaction was "an insider transaction made by the Defendant Directors and Shareholders to benefit the Martins and to further the interests of the other Defendant Directors and Defendant Shareholders in their continued business dealings with the Martins and each other." Plaintiffs maintain that a majority of the Defendant Directors were interested parties and that they breached their duty of loyalty to the shareholders. Their knowledge of their breaches of fiduciary duty is, according to Plaintiffs, evidenced by the executed releases from liability.

Plaintiffs claim that because the board of HAH consisted of Swift, Palles, and Kostuchenko, and because a majority of them - Palles and Kostuchenko - were interested in the complained-of transaction, any demand on the HAH board would have been futile and should be excused. Palles and Kostuchenko held the meeting without Swift, even though he requested that the meeting be postponed due to his unavailability (according to Plaintiffs, Swift was given less than 24 hours notice of the meeting). Plaintiffs also contend that it was futile to make a demand

on the Holdings board prior to filing suit since at least three of the board members were interested in the transaction. Furthermore, HAH was refused its seat on the Holdings board, and the Holdings board failed to submit the two other purchase offers to the shareholders. When the offers were raised for discussion, Lane reportedly stated: "F--- Swift," (with whom DeliverMed is associated) "give [Health Alliance] to Jamie [Martin]." Plaintiffs maintain that this hostility demonstrates the futility of any demand that would have been made.

Plaintiffs allege three counts against Defendants: (1) breach of fiduciary duty against Directors of Holdings, including allegations of lack of quorum, waste, no shareholder ratification, unfair sale by uninterested directors, and entering into unfair releases; (2) breach of fiduciary duties against shareholders of Holdings; and (3) participation in breach of fiduciary duties against purchasers. Defendants now move to dismiss these counts arguing that the complaint is deficient for the following five reasons: (1) Plaintiffs lack standing because their double-derivative action is prohibited by Delaware law; (2) Plaintiffs lack standing to assert derivative claims because both Holdings and HAH are insolvent; (3) Plaintiffs' claim is untimely under Delaware law, which requires that suits against "void" corporations be filed within three years from date of voiding; (4) Plaintiffs' allegations of futility of demand are insufficient as a matter of law; (5) the business judgment rule and consent by a majority of shareholders bar Plaintiffs' claims; (6) none of the individual defendants owns a majority of Holdings' stock or controlled the corporate conduct. For the following reasons, Defendants' Motions to Dismiss are granted.

## II. STANDARD OF REVIEW

A Motion to Dismiss under Rule 12(b)(6) requires that I analyze the legal sufficiency of the complaint, and not the factual merits of the case. *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). I must take all facts alleged in Plaintiffs' complaint as true and draw all reasonable inferences from those facts in favor of the Plaintiff. *Caldwell v. City of Elwood*, 959 F.2d 670, 671 (7th Cir. 1992). Plaintiff, for her part, must do more than solely recite the elements for a violation; she must plead with sufficient particularity so that her right to relief is more than a mere conjecture. *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff must plead her facts so that, when accepted as true, they show the plausibility of her claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Plaintiff must do more than plead facts that are "consistent with Defendants' liability" because that only shows the possibility, not the plausibility, of her entitlement to relief. *Id.* (internal quotations omitted).

## III. DISCUSSION

Defendants argue that Plaintiffs' double-derivative action is prohibited by Delaware law. Under Delaware law, "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson*, 477 A.2d 1040, 1050 (Del. 1984). There are two exceptions to this standing requirement: (1) where plaintiff claims that the merger was fraudulent; and (2) where the merger is a reorganization and plaintiff's ownership of the company is unaltered. *Id.* at 1047 n.10. Plaintiffs do not contend that either exception applies here. Instead, Plaintiffs seem to suggest that the contemporaneous ownership requirement is relaxed in a double derivative action. *Blasband v. Rales*, 971 F.2d 1034, 1043 (3d Cir. 1992) (citation omitted). Plaintiffs, shareholders of HAH,

are suing to compel HAH, in which they are shareholders, to sue derivatively on behalf of Holdings, in which Plaintiffs are not shareholders. Given these circumstances, Plaintiffs contend that their double derivative action does not require that they be shareholders of Holdings, the company allegedly harmed here.

Defendants maintain that the double-derivative action is limited to suits in which "a stockholder of a parent corporation seeks recovery for a cause of action belonging to a subsidiary." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *see also Sternberg v. O'Neil*, 550 A.2d 1105, 1107, n.1 (Del. 1988) (A "double derivative" action is a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company.") (citation omitted).[1] HAH was not Holdings' parent corporation, but rather a minority shareholder of Holdings. According to Defendants, where Plaintiffs are HAH

---

[1] Defendants also cite the following examples of persuasive authority: *Silver v. Allard*, 16 F. Supp. 2d 966, 968 (N.D. Ill. 1998) ("In a double derivative suit, such as the present case, a shareholder of a holding company seeks to enforce a right belonging to the subsidiary, [but] only derivatively to the holding company.") (internal quotation marks and citations omitted); *In re General Instrument Corp. Sec. Litig.*, No. 96 C 1129, 2000 WL 1742120, at *4 (N.D. Ill. Nov. 22, 2000) ("For example, a double derivative suit requires the plaintiff to meet or be excused from the demand requirement as to both the subsidiary and the parent corporation . . . ."); *Brown v. Tenney*, 532 N.E.2d 230, 235-36 (Ill. 1988) ("[W]e hold that a double derivative action may be maintained by a shareholder of record in a holding company, on behalf of a subsidiary controlled or dominated by the holding company, after due demand is made to, and rejected by, the subsidiary and the holding company."); *Mount Mansfield Ins. Group, Inc. v. Am. Int'l Group, Inc.*, 865 N.E.2d 524, 530 (Ill. App. Ct. 2007) ("Additionally, the shareholder companies of MMIG had no right to represent the interests of Mount Mansfied unless they brought a double derivative action, seeking a demand from both MMIG, the holding company, and Mount Mansfield as its subsidiary."); *Pessin v. Chris-Craft Indus., Inc.*, 181 A.D.2d 66, 72 (N.Y. App. Div. 1992) ("Where a stockholder controls a subsidiary, and there is no independence between the parent stockholder and the subsidiary . . . double derivative standing is conferred on the minority shareholders of the controlling shareholder.").

shareholders, and HAH owns stock in but does not control Holdings, Plaintiffs do not have double derivative standing.

Plaintiffs counter that Delaware courts have never expressly limited the double derivative mechanism to the parent/subsidiary context. They cite to *Blasband*, where the Court explained that "[a] double derivative action is identical in form to a traditional derivative action, except that in a double derivative the suit is brought on behalf of one corporation (e.g. a parent) to enforce a cause of action in favor of a related corporation (e.g. its subsidiary)." 971 F.2d at 1042-43. Since the court used the abbreviation "e.g." in its mention of parent and subsidiary, Plaintiffs assert that double derivative actions are not limited to the parent-subsidiary context, and that the parent-subsidiary model is but one example of where double-derivative standing applies. However, *Blasband* involved a derivative suit by a shareholder of a parent corporation against directors to challenge the pre-merger actions of the subsidiary. *Id.* at 1037-39. In its discussion, the Court noted that "[i]n a 'double derivative' action, the shareholder is effectively maintaining the derivative action on behalf of the subsidiary, based upon the fact that the parent or holding company has derivative rights to the cause of action possessed by the subsidiary." *Id.* at 1043 (citing 13 CHARLES R.P. KEATING, GAIL A. O'GRADNEY, FLETCHER CYCLOPEDIA OF CORPORATIONS § 5977, at 240 (rev. ed. 1991) (footnotes omitted)). The parent corporation "has the primary right to sue to redress the wrongs" alleged against the subsidiary, and as a shareholder of the parent, the plaintiff in that case had double derivative standing to sue. *Id.* Plaintiffs set forth no reason to depart from this understanding of a double derivative action, other than to say that nothing in the case law precludes the application of the double derivative to the non-parent/subsidiary context.

9

Case law and policy discourage the attachment of significance to the Third Circuit's use of the abbreviation "e.g." Plaintiffs point to no case outside the parent-subsidiary context where a plaintiff was granted double derivative standing. This suggests a general understanding that the double derivative suit applies only in the context of a parent-subsidiary relationship. Moreover, the double derivative action was fashioned to prevent insulation against wrongdoing brought about by the proliferation of the holding company. *Brown v. Tenney*, 532 N.E.2d 230, 233 (Ill. 1988). A shareholder in a holding company, a company "with a concentrated ownership of shares of stock in another company," cannot maintain a single derivative action against the subsidiary because it does not meet the share-ownership requirement. *Id*. In fact, no one other than the holding company could meet the threshold requirement, and the subsidiary could easily become an instrument of the holding company's misconduct, and the "additional layer in the corporate structure" would leave shareholders of the parent company without remedy. *Id*. "To prevent this from occurring, and falling victim to the alluring and disingenuous argument that a shareholder in a holding company has no interest in the subsidiary, courts have fashioned a remedy from the single derivative cloth-the double derivative suit." *Id.* In this case, however, HAH was never a parent or holding company of Holdings, and therefore double-derivative standing does not apply here. There were in fact many shareholders with an interest in Holdings, and any of those shareholders could have brought suit on Holdings' behalf.

Although Plaintiffs do not expressly address the policy considerations behind the double derivative action, they do, in Count II, allege that shareholders who voted to sell Holdings' membership interest in Health Alliance breached their fiduciary duty to minority shareholders. In light of this pleading, one might argue that Defendant Shareholders, just like a parent corporation, are using Holdings to insulate their own misconduct, and that the same policy

10

considerations for the double derivative action warrant its application here. In other words, HAH is the only shareholder that can sue, since the others have allegedly breached their duties.

Under Delaware law "a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Kahn v. Lynch Communications Systems, Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) (citation omitted). "[A] controlling shareholder exists when a stockholder: 1) owns more than 50% of the voting power of a corporation; or 2) exercises control over the business and affairs of the corporation." *In re PNB Holding Co. Shareholders Litigation*, No. Civ.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug 18, 2006).

Plaintiffs allege that the Holdings board "was controlled by MTS, Ashcroft, and Jamie Martin, who together with the other Related Entities also held a majority of the shares of Holdings." Plaintiffs do not define "Related Entities." "For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of the corporation conduct." *Kahn*, 638 A.2d at 1114 (Del. Ch. 1994). None of the individual shareholders named in the complaint was itself a majority shareholder. Plaintiffs' theory of liability is premised upon (1) the minority shareholders' actual control, and (2) the fact that Defendant Shareholders, none of whom are majority shareholders, *together* held a majority of the shares, thereby owing the remaining shareholders a fiduciary duty. However, Plaintiffs' pleadings fall short.

Jamie Martin allegedly "caused" Curtis Lane to refuse to consider other bids and to demand that directors "give" her Health Alliance. In support of their argument, Plaintiffs rely on the minutes of the disputed board meeting, citing to *Kahn*. There, a supermajority of 80% was

required for the approval of any business combination. *Id.* at 1112. The minutes of the meeting revealed that the defendant told board members, "We are 43 percent owner. You have to do what we tell you." *Id.* at 1114. The defendant threatened to take control of the company and to reject an acquisition thought to be a perfect fit by independent directors. *Id.* The court concluded that the non-defendant shareholders deferred to the defendant shareholder "because of its position as a significant stockholder and not because they decided in the exercise of their own business judgment that [defendant's] position was correct." *Id.* at 1115. In this case, no such discussions took place at the meeting in question; unlike in *Kahn*, there are no allegations of threat, intimidation or directives. Lane said "F--- Swift" and told the other board members to "give" Health Alliance to Jamie. But Plaintiffs provide no support for the allegation that Lane controlled the board, or that Jamie Martin influenced Lane.

Neither are other Defendant Shareholders successfully alleged to be a controlling shareholder. Plaintiffs provide no support for the proposition that any Defendant Shareholders "actually directed" the other shareholders to vote for the sale to Acquisition. *See In re Sea-Land Corp. Shareholders Litigation*, Civ. A. No. 8453, 1988 WL 49126, at *3 (Del. Ch. May 13, 1998) (claim against shareholder for breach of fiduciary duty dismissed where shareholder did not hold a majority of stock and plaintiff failed to allege any actual direction of the board by the shareholder to accept the transaction at issue). Without properly alleging actual control of the board, Plaintiffs cannot claim that Defendant shareholders had any fiduciary duty to Plaintiffs. Furthermore, it is difficult to understand how a duty can be imposed on a group of minority shareholders who, together, own a majority of the company's shares. To do so would mean that all minority shareholders who, when voting together, reflect a majority, automatically owe to the

other minority shareholders - those who do not vote with the majority - a fiduciary duty. This is not the standard recognized under Delaware law.

In the absence of a properly alleged fiduciary duty, the policy reasons for invoking a double derivative action are similarly absent. Accordingly, I find nothing in the facts of this case that would warrant double derivative standing outside the traditional parent-subsidiary context. For this reason, Defendants' motions to dismiss are granted.

ENTER:

James B. Zagel
United States District Judge

DATE: October 28, 2010